**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TINA L. HURLEY,

     *Plaintiff,*

*v.*                            CASE NO. 13-CV-10009

COMMISSIONER OF             DISTRICT JUDGE NANCY G. EDMUNDS
SOCIAL SECURITY,           MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant.*

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**[1]

**I.    RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

**II.    REPORT**

**A.    Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for Supplemental Security Income ("SSI")

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 10, 11.)

Plaintiff Tina Hurley was 38 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 7 at 37.) Plaintiff's employment history includes work as a babysitter for five years, a cashier for two years, an elder care worker for one year, a housekeeper for one year, and a retail stock worker for one year. (Tr. at 170.) Plaintiff filed the instant claim on December 5, 2008, alleging that she became unable to work on September 30, 2006. (Tr. at 128.) The claim was denied at the initial administrative stage. (Tr. at 50.) In denying Plaintiff's claim, the Commissioner considered obesity and other hyperalimentation and disorders of back, discogenic and degenerative, as possible bases for disability. (*Id.*) On December 16, 2010, Plaintiff appeared before Administrative Law Judge ("ALJ") Troy Patterson, who considered the application for benefits *de novo*. (Tr. at 11-23, 34-49.) In a decision dated March 4, 2011, the ALJ found that Plaintiff was not disabled. (Tr. at 19.) Plaintiff requested a review of this decision on March 15, 2011. (Tr. at 9-10.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on November 9, 2012, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-5.) On January 2, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B.      Standard of Review

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is

multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making

a determination of disability"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

without directly addressing in his written decision every piece of evidence submitted by a party");

*Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

### C.      Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe

impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

## D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since November 17, 2008, the application date. (Tr. at 16.) At step two, the ALJ found that Plaintiff's obesity, back pain, and diabetes mellitus were "severe" within the meaning of the second sequential step. (*Id*.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or

equaled one of the listings in the regulations. (*Id.*) At step four, the ALJ found that Plaintiff could perform her past relevant work as a child monitor. (Tr. at 19.) Alternatively, at step five, the ALJ found that Plaintiff could perform a full range of sedentary work. (Tr. at 16-19.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 19.)

### E.   Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that an MRI of Plaintiff's lumbar spine taken on November 6, 2001, showed "[d]isc dehydration and a small posterior annular tear of the intervertebral disc at L3-L4 level," but "[n]o evidence of frank disc herniation or spinal stenosis in the lumbar region." (Tr. at 248, 302.)

An MRI of Plaintiff's cervical spine taken on September 25, 2002, showed some "[d]egenerative discogenic/ spondylitic changes in mid cervical spine without superimposed disc herniation or canal stenosis." (Tr. at 247.)

On December 26, 2002, Lisa Guyot, M.D., Ph.D., reviewed Plaintiff's MRI scans and diagnosed "degenerative disk at L3-L4" and "recommended for her to go to the Medical Rehabilitation Group for physical therapy, possible epidural steroid injections and pain management." (Tr. at 303.)

On November 16, 2006, Plaintiff was referred to Wilbur J. Boike, M.D., a neurologist, for an examination. (Tr. at 245-46.) Dr. Boike noted that Plaintiff's "[e]tremity strength, coordination tone, and bulk are normal in all extremities, both proximally and distally. Sensory examination was normal to pin prick, light touch, joint position sense, and vibration in all extremities. Reflexes are 2 [inches] and symmetric at the biceps, triceps, brachiordialis, knees, and ankles" and there was only a "slight decrease in lumbosacral spine flexibility in flexion-extension, lateral flexion. and lateral rotation." (Tr. at 245.) Dr. Boike did not recommend surgery and instead indicated that

Plaintiff "may benefit from a course of physical therapy emphasizing stretching and strengthening of the lumbosacral and peripelvic musculature" so he "referred her for treatment at this facility." (Tr. at 246.)

On January 22, 2008, Plaintiff was examined at the request of Disability Determination Services ("DDS") by S. L. Schuchter, M.D. (Tr. at 239-44.) Dr. Schuchter diagnosed "obesity" and "low back pain." (Tr. at 240.) Dr. Schuchter found that Plaintiff could perform all of the tests conducted except that she could only stoop and squat and arise from squatting 3/4 of the way. (Tr. at 241.) Plaintiff could also heel and toe and tandem walk and was stable and within normal limits. (Tr. at 242.) Plaintiff's range of motion in the lumbar spine was 0-60 degrees, while normal is 0-90 degrees, and her extension, right and left flexion were 0-15 degrees while normal is 0-25 degrees. (Tr. at 243.) Plaintiff's range of motion in her knees was 0-95 degrees while normal is 0-150 degrees. (Tr. at 244.) All other ranges were normal. A CT scan of Plaintiff's abdomen taken on May 20, 2008, was a "negative study." (Tr. at 281.) X-rays of Plaintiff's knees taken on August 19, 2008, were "normal[.]" (Tr. at 279.) X-rays of Plaintiff's thoracic spine taken that same day were also "normal[.]" (Tr. at 280.)

On March 28, 2009, Plaintiff was examined at the request of DDS by Tama Abel, M.D. (Tr. at 285-89.) Dr. Abel noted that Plaintiff had smoked one pack of cigarettes a day for 23 years, and that Plaintiff was diagnosed with diabetes one year prior to the examination. (Tr. at 285.) Dr. Abel also noted that Plaintiff was 64.5 inches tall and weighed 371 pounds. (Tr. at 286.) Plaintiff's range of motion in the cervical spine, dorsolumbar spine, shoulders, elbows, hips, knees, ankles, wrists, hands and fingers were all normal, with back pain noted while performing the flexion of the dorsolumbar spine and forward flexion of the hip. (Tr. at 287-88.) Plaintiff's cranial nerves II-XII were "grossly intact. Motor strength and tone appeared normal. Sensory appeared intact to light

8

touch. Romberg testing was negative." (Tr. at 288.) It was also noted that Plaintiff "walked with a normal gait without the use of an assistive device" and that straight leg raising was negative in the seated position but was positive in the supine position, right greater than left, because Plaintiff complained of back pain while this test was performed although no radiating pain was elicited. (*Id.*) Dr. Abel concluded that Plaintiff's pain was being caused by a "combination of musculoskeletal pain and degenerative disc disease. . . . She was considered severely morbidly obese with a BMI of 62.7. Her obesity [was] likely contributing to her back discomfort as well." (Tr. at 289.)

A Physical Residual Functional Capacity ("RFC") Assessment was completed on April 22, 2009, by Nancy Sarti, a Single Decisionmaker ("SDM"). (Tr. at 290-97.) The assessment concluded that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk at least 2 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and was unlimited in her ability to push or pull. (Tr. at 291.) There were no postural, manipulative, visual, communicative or environmental limitations established. (Tr. at 292-94.)

On June 17, 2009, Plaintiff was referred to M. Ayman Bakleh, M.D., who examined Plaintiff and diagnosed "[u]ncontrolled diabetes for which I am going to increase her Metformin to 850 three times a day.  I advised her about diet and exercise." (Tr. at 82, 319, 353, 370.)

On August 18, 2009, Michael Frappier, D.O., authored a letter which stated, in its entirety:

Ms. Hurley has Degenerative Disc Disease of the lumbar and dorsal spine, Non Insulin Dependent Diabetes Mellitus, Morbid Obesity, Hyperlipidemia and Arthritis. Her degenerative disc disease combined with her morbid obesity cause chronic back pain with activity intolerance. Her limitations for sitting, standing, and walking is less than two hours at a time, she must be able to change positions frequently. No stairs, bending or crouching. She is unable to lift anything over ten pounds. The pain medications she takes cn cause drowsiness and dizziness; she is not [to] drive or operate heavy machinery while she is taking them. All of these combined make her unable to work. If you have any questions, please feel free to contact me.

(Tr. at 306, 309.)

On January 24, 2010, Dr. Frappier completed a Multiple Impairment Questionnaire. (Tr. at 344-51.) Dr. Frappier indicated that Plaintiff was last examined on November 10, 2009, and that the frequency of his treatment of Plaintiff was "as needed." (Tr. at 344.) Dr. Frappier diagnosed degenerative disc disease of the dorsal and lumbar spine, arthritis, morbid obesity and diabetes mellitus, and gave a "poor" prognosis based on Plaintiff's "lumbar spine pain increased with motion; decreased range of motion." (*Id.*) When asked to "[i]dentify the laboratory and diagnostic test results" that supported his diagnosis, Dr. Frappier listed the 2001 and 2002 MRI results, Dr. Guyot's letter discussing the 2002 MRI, and the June 2009 letter from Dr. Bakleh discussing Plaintiff's diabetes. (Tr. at 345.) Dr. Frappier concluded that Plaintiff could sit for 2 hours and stand or walk for 2 hours in an 8-hour workday, that Plaintiff would need to get up and move around every 2 hours for 20 minutes before being able to sit again. (Tr. at 346-47.) Dr. Frappier indicated that Plaintiff could occasionally lift and carry up to 10 pounds but could never lift or carry more than that. (Tr. at 347.)

As to upper extremities, Dr. Frappier found Plaintiff was minimally limited in grasping and using fingers/hands for fine manipulation and was moderately limited using arms for reaching. (Tr. at 348.) Dr. Frappier opined that Plaintiff would not be able to perform a full-time competitive job on a sustained basis and indicated that emotional factors of stress and depression would affect her abilities, although he indicated that Plaintiff could tolerate low stress. (Tr. at 349.) Dr. Frappier also opined that Plaintiff would need to take unscheduled breaks to rest every 2 hours for 20 minutes. (*Id.*) Dr. Frappier estimated that Plaintiff would be absent from work as a result of her impairments more than three times a month. (Tr. at 350.) Dr. Frappier also recommended no pushing, pulling, bending or stooping. (*Id.*)

On February 5, 2010, Dr. Bakleh indicated that Plaintiff's diabetes was "improving." (Tr. at 361, 376.)

Plaintiff indicated in her daily activity report that she is able to prepare "sandwiches, frozen dinners, 3 course meals" on a "daily" basis for an hour at a time, that she can drive and ride in a car, and can shop in stores for groceries and household items "3-4 times a month, [for] about 1½ hours." (Tr. at 206-07.) Plaintiff also stated that she is able to manage her own finances and socialize with her family, but that she "[l]ost all my friends because I can't get out and do all the things they do." (Tr. at 208-09.) Plaintiff also stated that "with my disabilities and criminal record I can't really do anything." (Tr. at 211.)

At the administrative hearing, Plaintiff testified that she lives in an apartment with her mother and two children and that she has to climb four to five steps to get into the apartment. (Tr. at 39.) Plaintiff indicated that she was 5 feet 6 inches tall, weighed 360 pounds, and had been a diabetic for two years at the time of the hearing. (Tr. at 40.) Plaintiff testified that when her blood sugar is high, "I feel lightheaded, my vision is blurred, and I feel sick to my stomach and sleepy." (Tr. at 40-41.) Plaintiff stated that she feels that way "almost every day, but not throughout the whole day," only for "four or five hours a day." (Tr. at 41.) Plaintiff stated that her back pain "comes and goes" but that she experiences pain "[e]very day." (Tr. at 42.) Plaintiff indicated that she can only walk or stand for "two to three minutes, tops" before she has too much lower back pain to continue. (*Id.*) After standing or walking, Plaintiff stated that she usually has to "sit down or I also take pain medication for it . . . [but] if it's severe enough, I have to lay down" once or twice a day for "about an hour to an hour and a half." (Tr. at 42-45.) Plaintiff also stated that she can only sit for "about 10, 15 minutes, and then I'd have to adjust or get up for a few minutes." (Tr. at 43.) Plaintiff further testified that she is able to lift and carry "[a]pproximately five to ten

pounds" and can bend over and pick things up off the ground. (Tr. at 43.) Plaintiff clarified that she cannot bend over frequently. (*Id.*)

Plaintiff testified that she does not participate in physical therapy for her back anymore and that it did not really help her; instead, "[a]fter the therapy, I was usually in more pain." (Tr. at 44.) Plaintiff indicated that she has been prescribed Hydrocodone for her back pain and that "[i]t controls it [the pain] pretty good," but that it makes her "jittery, a little bit of blurred vision, and sometimes it makes me drowsy," and that if she took the medication and went to work somewhere, she "really wouldn't be able to concentrate." (*Id.*)

When asked what a typical day is like, Plaintiff responded:

> Usually, I wake up around 9, 9:30, take my medication, eat breakfast, and then I'm usually sitting in the living room watching tv or sometimes on the computer. Then usually, I stay there until about dinnertime, and then I prepare dinner. And that's about it most of the day.

(Tr. at 46.) When asked whether she takes part in any household chores, Plaintiff responded that she grocery shops with the help of her children and she does "small things as far as cleaning up," but that she doesn't "do anything major." (*Id.*)

At the administrative hearing, the ALJ asked the Vocational Expert ("VE") to describe Plaintiff's past relevant work and he indicated that although the Dictionary of Occupational Titles ("DOT") places child monitor at the medium level, that "it was performed at the sedentary level on a part-time basis." (Tr. at 47-48.) Plaintiff's other past work was at the light level. (Tr. at 48.)

### F.    Analysis and Conclusions

### 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to return to her past relevant work as a child monitor. (Tr. at 19.)

The Commissioner's regulations state that the agency "will first compare our assessment of your residual functional capacity with the physical and mental demands of your past relevant work." 20 C.F.R. § 416.960(b); 20 C.F.R. §404.1560(b). "If you can still do this kind of work, we will find that you are not disabled." 20 C.F.R. § 404.1520(f); 20 C.F.R. § 404.1560(b)(3). "'By referring to the claimant's ability to perform a "kind" of work, [the regulations] concentrate[] on the claimant's capacity to perform a type of activity rather than his ability to return to a specific job or to find one exactly like it.'" *Boucher v. Apfel*, No. 99-1906, 2000 WL 1769520, at *7 (6th Cir. Nov. 15, 2000) (quoting *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995)).

An "ALJ [is] not required to solicit testimony from a VE in reaching his conclusion" that a plaintiff is able to perform her past relevant work. *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010) (citing 20 C.F.R. § 404.1560(b)(2) ("We *may* use the service of vocational experts . . . to help us determine whether you can do your past relevant work[.]") (emphasis in original); *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) ("The regulations permit an ALJ to use the services of a vocational expert at step four to determine whether a claimant can do his past relevant work . . . .")). Should the ALJ use the services of a VE, the ALJ need only incorporate those limitations into the hypothetical question that he finds credible and supported by the record. *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Alternatively, at step five, the ALJ found that Plaintiff could perform a full range of sedentary work. (Tr. at 16-19.) Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are

required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social

Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since
> being on one's feet is required "occasionally" at the sedentary level of exertion,
> periods of standing or walking should generally total no more than about 2 hours of
> an 8-hour workday, and sitting should generally total approximately 6 hours of an
> 8-hour workday. Work processes in specific jobs will dictate how often and how
> long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10, 1983 WL 31251, at *5.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his

application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to

the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc.

10.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the

decision must be affirmed even if this Court would have decided the matter differently and even

where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833;

*Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision,

it must be upheld.

Specifically, Plaintiff contends that the ALJ "failed to follow the treating physician rule"

by giving no weight to Plaintiff's treating physician, Dr. Frappier, and instead relying on the

opinion of the examining physician, Dr. Abel. (Doc. 10 at 6-10.) Plaintiff also contends that the

ALJ "failed to properly evaluate [Plaintiff's] credibility." (*Id.* at 10-13.) Finally, Plaintiff argues

that the ALJ "erred by finding [Plaintiff] could perform her past work" because her "past work as

a child monitor never raised to the level of substantial gainful activity [and] [t]herefore, it cannot

be considered past relevant work." (*Id.* at 13-14.)

14

**a.**    **Treating Sources**

**i.**    **Standards**

"Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources' that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." SSR 06-3p, 2006 WL 2329939, at *2 (2006).

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(c)(3). "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

Since the Commissioner is responsible for determining whether a claimant meets the statutory definition of disability, the ALJ "will not give any special significance to the source of an opinion[, including treating sources], on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section[,]" i.e., whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, residual functional capacity, and application of vocational factors. 20 C.F.R. § 404.1527(d)(3). A "[d]octor's notation in his notes of a claimed

symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' [Thus,] [a]n ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011). "Otherwise, the hearing would be a useless exercise." *Id.*

In addition, "a treating physician's assessment may be unreliable because of the bias he or she may bring to the disability evaluation," i.e., he or she "'may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.'" *Id.* at 1073 (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)). "Additionally, we have noted that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise." *Dixon*, 270 F.3d at 1177. "[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight . . . [but] 'is just one more piece of evidence for the administrative law judge to weigh . . . .'" *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quoting *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)). Once the treating source is placed on the same level as other medical opinions, the treating source opinion should not be subjected to "greater scrutiny" than the non-treating sources, especially when there are more flagrant inconsistencies in the opinions of the non-treating sources. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379-80 (6th Cir. 2013).

If the ALJ declines to give controlling weight to a treating source's opinion, then he must use the following factors to determine what weight the treating source opinion should be given: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. These factors

may be applied to all medical opinions, not just treating sources. SSR 06-3p, 2006 WL 2329939, at *3 (2006). However, because of the special status of treating source opinions, where the ALJ "failed to conduct the balancing of factors to determine what weight should be accorded these treating source opinions . . . , [t]his alone constitutes error." *Cole v. Comm'r of Soc. Sec.,* 652 F.3d 653, 660 (6th Cir. 2011) (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009)). But this error is not always dispositive and can be considered "harmless error" if: "(1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of § 1527(d)(2) . . . even though she has not complied with the terms of the regulation." *Cole*, 661 F.3d at 940 (quoting *Wilson*, 378 F.3d at 547).

A physician qualifies as a treating source if the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." 20 C.F.R. § 404.1502. "Acceptable medical sources" who can be considered treating sources include "licensed or certified psychologists." SSR 06-03p, 2006 WL 2329939, at *1-2 (2006). After treating sources, a "nontreating source, who physically examines the patient 'but does not have, or did not have an ongoing treatment relationship with' the patient, falls next along the continuum." *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) (quoting *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). "'The opinion of a non-examining physician, on the other hand, 'is entitled to little weight if it is contrary to the opinion of the claimant's treating physician.'" *Adams v. Massanari*, 55 F. App'x 279, 284 (6th Cir. 2003) (quoting *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987)).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

### ii.   Analysis

Plaintiff contends that the ALJ "failed to follow the treating physician rule" by giving no weight to Plaintiff's treating physician, Dr. Frappier, and instead relying on the opinion of the examining physician, Dr. Abel. (Doc. 10 at 6-10.) The ALJ expressly and thoroughly considered Dr. Frappier's opinion, stating:

> Dr. Frappier's opinion is based on a 2001 MRI which showed a small posterior annular tear of the intervertebral disc at the L3-L4 levels and a very extremely small herniated disc at L6-L7 (Exhibit 6F p.3). The undersigned assigns no weight to the opinion of Dr. Frappier because the opinion is conclusory and inconsistent with the record as a whole, including objective findings from the 2001 lumbar spine MRI showing no significant herniated disc, no spinal stenosis and no impingement on the spinal cord (Exhibit 6F, pp. 3-4). Moreover, Dr. Frappier's treatment of the claimant consisted of prescribed pain medication and therapy but no surgical intervention. Although treating physician's opinions are highly probative of the claimant's condition, such an opinion cannot be given great weight in the event a contrary opinion is more persuasive and consistent with the bulk of the evidence. Here, the record contains physical examination results from Tama D. Abel, M.D., which casts

18

doubt upon the extent of the claimant's limitations as opined by Dr. Frappier. (Exhibit 3F).

(Tr. at 17-18.)

First, Dr. Frappier's conclusion that Plaintiff is not able to work is an opinion on the ultimate issue of whether a claimant is disabled which is reserved to the Commissioner and therefore is not entitled to any weight. 20 C.F.R. § 404.1527(d)(3). Second, the ALJ properly analyzed and stated the reasons for his conclusions pursuant to the requirements of SSR 96-2p, 1996 WL 374188, at *5 (1996).

Finally, I suggest that the ALJ's reasoning is supported by substantial evidence. When asked to "[i]dentify the laboratory and diagnostic test results" that supported his diagnosis, Dr. Frappier listed the 2001 and 2002 MRI results, Dr. Guyot's letter discussing the 2002 MRI, and the June 2009 letter from Dr. Bakleh discussing Plaintiff's diabetes. (Tr. at 345.) As noted by the ALJ, neither these test results themselves nor Dr. Guyot's assessment of them support Dr. Frappier's conclusions regarding Plaintiff's functional capacity. The 2001 MRI of the lumbar spine showed only "[d]isc dehydration and a small posterior annular tear of the intervertebral disc at L3-L4 level" but "[n]o evidence of frank disc herniation or spinal stenosis in the lumbar region." (Tr. at 248, 302.) The 2002 MRI of the cervical spine showed only "[d]egenerative discogenic/spondylitic changes in mid cervical spine without superimposed disc herniation or canal stenosis." (Tr. at 247.) Dr. Guyot's assessment of the MRI results does not support Dr. Frappier's conclusions because although she diagnosed "degenerative disk at L3-L4," she only "recommended for her to go to the Medical Rehabilitation Group for physical therapy, possible epidural steroid injections and pain management." (Tr. at 303.) Finally, Dr. Bakleh's letter of June 2009 diagnosed "[u]ncontrolled diabetes[,]" but only recommended medication changes and he "advised her about diet and exercise." (Tr. at 82, 319, 353, 370.) I therefore suggest that the

19

medical evidence that Dr. Frappier cited in support of his conclusions actually contradicts his opinion.

In addition, many of Dr. Frappier's conclusions are based on Plaintiff's reported symptoms rather than medical test results. (Tr. at 346-50.) Conclusions such as this are not medical evidence and therefore the ALJ is not required to accept an opinion based on such assertions. *See Masters,* 818 F. Supp. 2d at 1067. Moreover, Dr. Frappier's opinions regarding Plaintiff's alleged stress and depression are not supported by any evidence of record and are outside his field of expertise and, thus, would not be entitled to controlling weight. *See Johnson,* 652 F.3d at 651.

Finally, I suggest that there is well-supported, contradicting evidence from Drs. Schuchter and Abel (Tr. at 239-44, 285-89) such that the ALJ was permitted to consider Dr. Frappier's opinion as "'just one more piece of evidence for the administrative law judge to weigh . . . .'" *Bauer,* 532 F.3d at 608. For example, although Dr. Frappier cited Plaintiff's decreased range of motion as a reason behind his conclusions (Tr. at 244), there is no evidence that Dr. Frappier ever performed such tests. On the other hand, Dr. Abel found Plaintiff's range of motion in the cervical spine, dorsolumbar spine, shoulders, elbows, hips, knees, ankles, wrists, hands and fingers were all normal, with back pain noted only when performing the flexion of the dorsolumbar spine and forward flexion of the hip. (Tr. at 287-88.) In addition, Dr. Schuchter found Plaintiff's range of motion in all joints was normal except for her lumbar spine and knees, and even those were not severely limited. (Tr. at 243-44.)

I therefore conclude that the ALJ's decision not to give any weight to Dr. Frappier's opinion was supported by substantial evidence.

**b.    Credibility Analysis**

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). When weighing credibility, an ALJ may give less weight to the testimony of interested witnesses. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) ("a trier of fact is not required to ignore incentives in resolving issues of credibility"); *Krupa v. Comm'r of Soc. Sec.*, No. 98-3070, 1999 WL 98645 at *3 (6th Cir. Feb. 11, 1999) (unpublished). However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky*, 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p. In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

21

Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *Id.* Although a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," C.F.R. §§ 404.1528(a), 416.929(a), "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded *solely* because they are not substantiated by objective medical evidence." SSR 96-7p, at *1 (emphasis added). Instead, the ALJ must consider the following factors:

(i)  [D]aily activities;

(ii)  The location, duration, frequency, and intensity of . . . pain;

(iii)  Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)  Treatment, other than medication, . . . received for relief of . . . pain;

(vi)  Any measures . . . used to relieve . . . pain.

*Felisky*, 35 F.3d at 1039-40; SSR 96-7p, at *3. Furthermore, the consistency of the evidence, including a claimant's subjective statements, is relevant in determining a claimant's credibility. 20 C.F.R. § 404.1527(c); SSR 96-7p, at *5.

In the instant case, the ALJ thoroughly considered each of the above factors. (Tr. at 16-19.) I suggest that substantial evidence supports the ALJ's findings for the reasons stated above under

22

the treating source analysis. In addition, Plaintiff's treatment consisted of prescription medication only. Such modest treatment is inconsistent with a finding of disability. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007). I also note that the ALJ's analysis is supported by Plaintiff's own statements that she is able to prepare "sandwiches, frozen dinners, 3 course meals" on a "daily" basis for an hour at a time, that she can drive and ride in a car, shop in stores for groceries and household items "3 to 4 times a month, [for] about 1½ hours[,]" manage her own finances and socialize with her family. (Tr. at 206-09.) *See Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

### c.    Past Relevant Work

Plaintiff argues that the ALJ "erred by finding [Plaintiff] could perform her past work" because her "past work as a child monitor never raised to the level of substantial gainful activity [and] [t]herefore, it cannot be considered past relevant work." (Doc. 10 at 13-14.) Plaintiff argues that her maximum earnings while working as a child monitor were $120 per week or no more than $600 per month. Plaintiff further argues that since substantial gainful activity ("SGA") was defined as $830 per month in 2005 when she worked as a child monitor, her work was not SGA and, thus, child monitor cannot be considered past relevant work. (Doc 10 at 13-14.) Defendant responds that reference to Plaintiff's reported earnings tells a different story, i.e., that she earned $6,465 in 2005, that she indicated she only worked for six months that year, and, thus, that she earned $1,077.50 per month, which exceeds the amount presumed to constitute SGA. (Doc. 11 at 16-17; Tr. at 159, 170.)

Past relevant work is defined as "work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn

23

to do it." 20 C.F.R. § 404.1565(a). There is a rebuttable presumption that the employee was or was not engaged in substantial gainful activity if the employee's average monthly earnings are above or below a certain amount established by the Commissioner's Earnings Guidelines. 20 C.F.R. §§ 404.1574(B)(2)-(3), 416.974(B)(2)-(3). Under the Program Operations Manual System's ("POMS") Tables of SGA Guidelines and Effective Dates Based on Year of Work Activity, for 2005, the countable earnings would be considered "substantial" if the amount averages more than $830 per month. POMS DI 10501.015, Tbl. 2, available at https://secure.ssa.gov/apps10/poms.nsf.

The fact that Plaintiff's work was part-time does not alone indicate that it was not SGA. Pursuant to the regulations, "[p]art-time work that was substantial gainful activity, performed within the last 15 years, and lasted long enough for the person to learn to do it constitutes past relevant work, and an individual who retains the RFC to perform such work must be found not disabled." SSR 96-8p n.2, 1996 WL 374184, at *8.

Defendant correctly cites Plaintiff's 2005 reported income as $6,465. (Tr. at 159.) In addition, Plaintiff's work history report indicates that she only worked from March to September in 2005, i.e., 6 months, which equates to an average monthly income of $1,077.50. (Tr. at 170.) I note that even if Plaintiff meant to include the month of September, she would have worked 7 months that year and her average monthly income would have been $909.00 per month, which also exceeds the presumptive SGA value of $830 per month. I therefore suggest that it was proper for the ALJ to presume that Plaintiff's work as a child monitor was past relevant work.

However, even if Plaintiff's past work as a child monitor was not presumptively SGA under the regulations cited above, I suggest that the ALJ's treatment of the work as SGA was not in error since "Plaintiff received pay and performed significant physical and mental activity" in her job.

*King v. Astrue*, No. 3:10-0750, 2011 WL 2433685, at * 12 (M.D. Tenn. June 14, 2011) (citing definitions of substantial activity and gainful activity).

I therefore suggest that the ALJ did not err in considering Plaintiff's past work as a child monitor to be past relevant work at Step Four of his analysis.

### 3.   Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   __REVIEW__

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail

with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ 𝔆harles 𝔈 𝔅inder

CHARLES E. BINDER
Dated: October 3, 2013                                    United States Magistrate Judge


**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  October 3, 2013                         By    s/Patricia T. Morris
                                                          Law Clerk to Magistrate Judge Binder